IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEIL D. KELLER                                      *

     Plaintiff,                                  *

v.                                                 *

                                         **Civil No. PJM-04-2665**

TOMMY G. THOMPSON,[1]                              *
Secretary, U.S. Department of
Health & Human Services                            *

     Defendant.                                  *

## OPINION

### I.

Neil Keller, *pro se*, has filed an employment discrimination suit against the United States Department of Health and Human Services (DHHS), alleging that he was discriminated against and harassed because of his race (white, non-Indian), religion (Jewish), and disability (post traumatic stress disorder), and retaliated against on account of prior EEO activity. Defendant Michael O. Leavitt has filed a Motion to Dismiss or, in the alternative, for Summary Judgment. For the reasons stated herein, the Court GRANTS the Motion.

### II.

From October 1991 until early December 1999, Keller was employed by Indian Health Services (IHS), a division of DHHS. Over the course of his eight-year employment, he filed several

---

[1]    During the pendency of these proceedings Thompson was replaced as Secretary of DHHS by Michael O. Leavitt. Leavitt will be referred to hereinafter as Defendant.

EEO complaints against IHS consisting of allegations of religious and racial harassment and discrimination.

On November 29, 1999, Keller entered into a "no-fault" settlement agreement with DHHS and IHS (Settlement Agreement), in which he agreed that he would withdraw and dismiss with prejudice all complaints, grievances, charges, and appeals he had filed concerning his employment at IHS, and that he would not file any other action with respect to the allegations made in his previous EEO complaints.  He also released DHHS and IHS from all claims "that may arise from any matter encompassed in" his prior complaints.  In exchange, DHHS and IHS paid $15,000 toward Keller's attorneys' fees and agreed to reassign him to the Division of Financial Operations, Program Support Center (PSC), a wholly separate operating division of DHHS, where he would serve as a Systems Accountant at the GS-14-4 level.  Keller began his employment with PSC on or about December 3, 1999.

Despite his stated intention "to get away from" the allegedly anti-Semitic environment at IHS, Keller admits in his Complaint and Opposition Memorandum that he "did not want to leave [his former supervisor at IHS] in disarray" and therefore agreed to "help out" by answering questions about the work he had performed at IHS.  Accordingly, he returned to IHS's office (which is located in the same building as the PSC office) approximately three times between December 6, 1999 and December 23, 1999 to help answer questions posed by his former IHS supervisor.

On December 23, 1999, Keller "went down to [his] old office . . . to get [his] last belongings and say Merry Christmas to [his] ex co-workers" and "to say good-bye to [his former co-worker] (who was retiring)."[2]  When Keller entered his former cubicle, he allegedly found swastikas drawn

---

[2]

Keller's former IHS supervisor, who he had been assisting, was on official leave at the time

on three separate documents as well as on his nametag that was hanging on IHS's phone-message board.

Keller immediately reported the swastika drawings to the Deputy Director of the Division of Financial Management, then went to see Vernon Mabry, an EEO counselor at IHS, to initiate a formal complaint of religious discrimination and retaliation based on his previous EEO complaints.

Keller and Mabry discussed the swastika-drawing incident on December 23, 1999 and January 19, 2000.  Mabry thereafter conducted an independent investigation that lasted approximately two months, entailing numerous interviews with IHS employees and managers.  The investigation revealed that there had never been a reported incident involving swastikas in the building prior to this and that no one (other than the perpetrator) had seen the swastika drawings until after Keller discovered them, despite several IHS employees having been in and out of Keller's former cubicle and near the phone-message board earlier that day.

Nevertheless, on March 7, 2000 Keller filed a formal complaint against DHHS and IHS regarding the swastika drawings, claiming that DHHS and IHS were in breach of the Settlement Agreement.  On April 20, 2000, DHHS dismissed the complaint for failure to state a claim, in large part based on its conclusion that Keller was not an employee of IHS when he visited the IHS office on December 23, 1999.  DHHS also determined that the swastika drawings constituted an isolated incident and that Keller had suffered no adverse employment action as a result.  Keller appealed to the EEOC's Office of Federal Operations (OFO), which reversed DHHS's opinion, finding that the drawings of the swastikas were so egregious that Keller's complaint could not be dismissed for failure to state a claim.  OFO remanded the case to DHHS for further proceedings.

_____

and had not requested Keller's assistance.

While Keller's claim was pending on remand, and nearly two years after the swastika-drawing incident, Keller allegedly received an anonymous "hate" letter postmarked Lancaster, Pennsylvania.  The letter, which Keller received on or about October 9, 2001, read as follows:

> Keller:
>
> WAKE UP!
>
> Do the Jewish community a favor and spare it any more of your banal, yada-yada brain farts about the Middle East and world events.
>
> From here on out, you'd be better off restricting your activity to something you may know something about:  Jewish celebrity memorabilia.  Or learning more about your job and world culture, so that you do not continue to embarrass yourself by confusing an ancient Indian symbol for the nazi swastika.
>
> It is nice that you are now using your own e-mail address in your collecting activity, rather than the Social Security one you were using before.  You are lucky no one dropped a dime on you to the Social Security webmaster (or the RELIABLE SOURCE) for doing that – since it is a violation of FEDERAL LAW to use a government account for personal business activity.

Although IHS has no facilities in or near Lancaster, Pennsylvania, in November 2001 Keller amended his EEO complaint to include the anonymous letter as an additional act of harassment by IHS.

On October 2, 2002, Administrative Law Judge (ALJ) Marlin D. Schreffler issued his decision relative to Keller's complaint.  He concluded that Keller had failed to establish by a preponderance of the evidence that DHHS unlawfully discriminated against him on any basis.  On November 15, 2002, DHHS issued its Final Agency Decision affirming the ALJ.  Keller appealed from this decision, and on May 11, 2004 the OFO affirmed the Final Agency Decision, finding that DHHS and IHS were in substantial compliance with the terms of the Settlement Agreement.

4

Keller filed the instant Complaint thereafter.  Although the Complaint is somewhat disjointed, the Court understands it to allege that:  (1) Keller was discriminated against because of his race, religion, and disability; (2) was retaliated against because of his EEO activities; and (3) was subjected to a hostile work environment.

### III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of any material issue of fact.  *Celotex*, 477 U.S. at 323.  Once the moving party satisfies his initial burden, the non-moving party "may not rest upon his allegations," but must present evidence demonstrating the existence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court is obliged to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Comp. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, the non-moving party cannot create a genuine issue of material fact through mere speculation or by piling one inference upon another.  *Collier v. Service Am. Corp.*, 934 F. Supp. 168, 171 (D. Md. 1996).  A mere scintilla of evidence supporting the non-movant's case is insufficient.  *Anderson*, 477 U.S. at 248.

### IV.

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, makes it unlawful for an employer "to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion,

sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits employers from retaliating against employees who assert their right to be free from perceived discrimination.  *Id.* § 2000e-3(a).

To state a claim of employment discrimination, a plaintiff must prove that he was the victim of intentional discrimination.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Intentional discrimination may be proved by two methods.  *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 324 (D. Md. 2003); *Fairclough v. Bd. of County Commissioners of St. Mary's County*, 244 F. Supp. 2d 581, 587 (D. Md. 2003).

First, the plaintiff may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue."  *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) (citation omitted).   To survive summary judgment with respect to this method of proof, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Id.* (citation omitted).  The plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Id.* (citation omitted).

The second method of proof by which a plaintiff can prove intentional discrimination, particularly where he is claiming disparate treatment relative to other employees, is the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *See Fairclough*, 244 F. Supp. 2d at 587.  Only the first step of the *McDonnell Douglas* framework–the prima facie case–is relevant here.  To state a prima facie case for discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered

an adverse employment action; (3) he was meeting his employer's legitimate performance expectations at the time of the adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Frank v. England*, 313 F. Supp. 2d 532, 538 (D. Md. 2004).

## V.

It is a prerequisite to a viable claim for employment discrimination that a plaintiff be employed by, or seeking employment from, the allegedly discriminating employer at the time of the alleged discrimination. *See King v. Dalton*, 895 F. Supp. 831, 836 (E.D. Va. 1995) ("[A] threshold requirement for imposing Title VII liability against the federal government is that the plaintiff be an 'employee[] or applicant[] for employment' of the defendant federal agency."). The record demonstrates that as of December 3, 1999, which preceded the swastika-drawing incident and the hate letter incident, Keller was no longer an IHS employee; he was employed by PSC as a Systems Accountant. Keller, however, claims that during December 1999 he was on "dual-duty status" due to his former IHS supervisor's request that he help answer questions concerning his former IHS position.[3] He also submits that the particular DHHS sub-agency with which he was employed is

---

[3]
    Again, however, it is worth noting that on December 23, 1999, when Keller discovered the swastikas, his former IHS supervisor was on official leave and had not requested Keller's assistance.

immaterial since his lawsuit is against the Secretary of DHHS.[4]  The Court will assume *arguendo*

that Keller was an "employee" for the purposes of pursuing his Title VII claims in this case.

## VI.

While Keller refers to a number of different incidents as the bases of his various claims, only

two qualify for consideration.  The others are not actionable either because they were covered by

the Settlement Agreement or because Keller failed to exhaust his administrative remedies as to them.

*See Zografov v. V.A. Med. Ctr.*, 779 F.2d 967, 968-96 (4th Cir. 1985).  These include his receipt of

chain e-mails of race-related jokes; the denial of a desk audit and a potential promotion; a report by

the Federal Mediation and Conciliation Service following the swastika-drawing incident that

concludes that the atmosphere at IHS was "highly discriminatory"; a co-worker calling Keller "Jew

Boy" and IHS's failure to discipline this co-worker; IHS's failure to provide Keller with a statutorily

mandated notice of Indian preference laws; IHS's failure to follow EEO rules and regulations in the

processing of his complaints; IHS's discriminatory actions against Keller based on his disability

(post traumatic stress disorder); failure to transfer his personnel file from IHS to PSC; and the IHS

EEO director's disclosure of "sensitive" information about Keller to PSC.

While Keller recognizes that claims based on these incidents are barred by the Settlement

Agreement, he urges the Court to "set aside" the Settlement Agreement and allow him to pursue

claims based on the above allegations.  He cites no authority or indeed any plausible justification

---

[4]

The issue of whether one ceases to be an employee of a government agency or of a corporation if he is moved from one division to another within the same agency or corporation (particularly if he remains in the same building) does not appear to have come up in the case law. Obviously, it is possible, depending on such matters as the proximity of the prior and subsequent offices as well as the extent of conflict between employees of the two offices, that the change may only be of slight degree.  The Court need not decide this issue at this time since it will assume that Keller continued in employee status for the purposes of this suit.

why the Court should do so.  Given that "[s]ettlement agreements are contracts and are governed by general principles of contract law," *Bryum v. Bear Inv. Co.*, 936 F.2d 173, 175 (4th Cir. 1991), the Court finds no basis to do so.

Accordingly, the Court will grant summary judgment as to all claims arising out of the above allegations set forth in the first paragraph of this Section.

## VII.

The Court turns to Keller's claim of discriminatory treatment on the basis of race and religion.

This claim is separate and distinct from Keller's hostile work environment claim, which the Court will address presently.  In this claim, Keller alleges that he suffered an adverse employment action because of his religion (Jewish) and his race (white, non-Indian).  The Court disagrees. Taking the swastika and hate letter incidents as established, he has failed to show how he was in any way subjected to an adverse employment action, much less that any nexus exists between these incidents and any claimed loss of benefits.  Apart from this he has not pointed to one single similarly situated employee who was treated more favorably than he.

An adverse employment action is a discriminatory act that adversely affects "the terms, conditions, or benefits of employment." *Von Gunten v. State of Maryland*, 243 F.3d 858, 866 (4th Cir. 2001).  "Conduct short of 'ultimate employment decisions' [e.g., hiring, firing, promoting, granting leave, and compensating] can constitute adverse employment action," if it affects a significant change in employment status. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2005) (citation omitted).

Keller seems to allege that he suffered four adverse employment actions: (1) he was passed over for a desk audit for four years and therefore denied a potential promotion; (2) his complete employment personnel file was not transferred from IHS to PSC despite his repeated requests; (3) the IHS EEO director sent sensitive information regarding his case to his supervisor at PSC; and (4) he did not receive a performance bonus for 1999 despite his "outstanding" performance evaluation.

As noted above, however, the first three actions cannot serve as the basis for Keller's discrimination claims inasmuch as they were either covered by the Settlement Agreement or were not raised by Keller during the EEO process. As for the sole remaining alleged adverse employment action, denial of a discretionary bonus,[5] the exact particulars and timing of which are not clear from the Complaint, once again there is no plausible nexus between this and the swastika and the hate letter incidents. Keller has not shown in the least that DHHS, IHS, or any of their employees might have been responsible for either the drawings or the letter. He admits that over two hundred people had access to his former desk at IHS and that IHS's office was essentially open to the public. Where there is no basis whatsoever to link a random unwelcome act or two to an employer's decision not to provide a discretionary benefit, there can be no finding of illegal discriminatory treatment. *See Brinkley*, 180 F.3d at 608 (the alleged discriminatory act must be "related to the employment decision in question" to be evidence of intentional discrimination).

---

[5] The Court will assume that denial of discretionary bonus, under certain circumstances, can be an adverse employment action. *But see Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) ("[L]oss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus.").

Insofar as Keller is claiming that he was treated less favorably than Indian co-employees, i.e., was denied a bonus when they received theirs, he has specified no comparators, wholly apart from failing to show any nexus between denial of the bonus and any discriminatory animus against him.

Accordingly, summary judgment is appropriate for Leavitt on Keller's direct discrimination claims.

## VIII.

Keller next submits that he was retaliated against by reason of his previous EEO activity. Again, while direct evidence of retaliation is obviously admissible in this regard, Keller is unable to offer any. He cannot show, for example, that whoever was responsible for awarding bonuses decided to deny him a bonus because he had complained of discrimination on earlier occasions.

To establish a prima facie case of retaliation under *McDonnell Douglas*, *see Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 586 (D. Md. 2002), Keller would have to show that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). Here, too, his case falters.

Certainly Keller's extensive history with the EEO process qualifies as engaging in a protected activity. However, again, Keller has not established that he suffered any adverse employment action, much less that such action was causally linked to his prior EEO activity.

The Court will therefore grant summary judgment for Leavitt as to the retaliation claim.

## IX.

11

Keller's final claim is that he was subjected to a hostile work environment.

Courts have found a hostile work environment where the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).

To establish a hostile work environment claim, Keller must prove that the offending conduct was (1) unwelcome; (2) based on his race or religion; (3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment; and (4) imputable to his employer. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006); *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). As to the fourth element—that the harassment be imputable to the employer—the employer may be liable based on its negligence if it knew or should have known about the harassment and failed to take effective action to stop it. *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).

The Court acknowledges that the swastikas and the hate letter would be unwelcome to someone of the Jewish faith, which satisfies the first two elements of a hostile work environment claim. But Keller's only allegations of "offending conduct" and harassment not barred by the Settlement Agreement or Title VII's exhaustion requirement are the swastika drawings and the

anonymous letter.[6]  These do not suffice to satisfy the third and fourth elements of a hostile work environment claim.

As to the third element, the swastikas and the hate letter taken together were not, as a matter of law, sufficiently severe or pervasive as to have altered the conditions of Keller's employment. In general, "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct." *AMTRAK v. Morgan*, 536 U.S. 101, 115 (U.S. 2002).  "[A] single act can meet the threshold [of hostile work environment] if, by itself, it can and does work a transformation of the plaintiff's workplace, but such a single act must be 'extraordinarily severe.'" *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004) (citations omitted).  Keller offers no more than two isolated incidents which took place two years apart, both of which occurred while he was no longer a full-time IHS employee, and one of which occurred when he was clearly at at least some physical remove from the IHS office.[7]

---

[6]

Although neither party has addressed the issue, the Court has considered whether evidence of incidents covered by the Settlement Agreement, while not in and of themselves actionable, might be admissible as background evidence for the two incidents that are not otherwise barred. *See, e.g.*, *Freeman v. Potter*, 2005 U.S. Dist. LEXIS 19619, at *10 n.2 (W.D. Va. 2005).  The Court concludes that the incidents covered by the Settlement Agreement would not be admissible as background evidence.  For $15,000 in attorneys fees and a transfer away from IHS, Keller bargained away his right to rely upon these incidents for any purpose when he entered into the Settlement Agreement and released all "claims, action, causes of action, rights and remedies *that may arise from any matter encompassed in the above-referenced complaint*."  For the Court to hold otherwise would be to deprive DHHS and IHS of the benefit of their bargain.

[7]

Leavitt makes much of the fact that Keller was transferred from IHS to PSC in December 1999, arguing that Keller's transfer effectively changed his "workplace," such that any events that occurred post-transfer could not affect his "workplace."  Again, the Court assumes that post-transfer harassment by IHS employees, if sufficiently severe and pervasive, could still be sufficient to establish a hostile work environment claim.  Keller and presumably his alleged harassers were, after all, all DHHS employees working in the same building.  Keller's transfer remains relevant, but not

Second, even if the two incidents were deemed to amount to severe and pervasive harassment, Keller has in no way shown how this could be imputed either to IHS or DHHS.  He has not shown that IHS or DHHS knew or should have known about the harassment or that either failed to take appropriate corrective action.  DHHS and IHS took immediate corrective action when placed on notice about the swastika drawings.  The Deputy Director of the Division of Financial Management promptly searched Keller's former cubicle and the surrounding area for other offensive material and contacted other managers and supervisors to alert them of the incident.  IHS's EEO counselor met with Keller at least twice concerning the event and conducted a prompt and thorough investigation.  The Chief Financial Officer and Director of Headquarters Operations went to the Division of Financial Management and spoke with the IHS employees concerning DHHS's zero-tolerance policy toward discrimination.  Given that the IHS office was essentially open to the public and that Keller admits that "approximately 200 people had access to [his former] desk," it strains reasons to fault DHHS or IHS for not identifying the alleged perpetrator.

As for the anonymous letter from Lancaster, Pennsylvania, Keller asserts only that he "received an anonymous letter *at his house* that could be considered threatening" (emphasis added) and that "[t]here is a strong inference that someone connected with the agency who was knowledgeable about the plaintiff's claims sent this letter."  It is highly doubtful that IHS had any obligation to investigate a single anonymous hate letter sent to a former employee's home almost two years after a possibly related incident had occurred at work.  In any case, IHS and DHHS submit that they had no opportunity to investigate and respond to this incident because they did not learn

---

for the reasons advanced by Leavitt.  It is relevant on the issue of imputability to the employer. Once Keller was transferred, IHS had little or no reason to know of or concern itself with the alleged harassment because, officially at least, Keller was no longer its employee.

of it until Keller moved to amend his EEO complaint in November 2001. It would be unfair, they say, to hold them to account because of this. While the Court agrees with the agencies, there is somewhat more to be said besides simply that it would be unfair.

The process of evaluating complaints of illegal discrimination in employment (including hostile work environment claims) contemplates a consultation by the complainant with the agency, an opportunity for the agency to investigate the claim and, where appropriate, an opportunity to conciliate or even settle a claim. That did not happen with regard to the hate letter incident because it came after the complaint based on the swastika-drawing incident was in process. The letter claim was simply tacked on to the complaint and eventually the ALJ dealt with it on the merits. (The record does not reflect any formal order granting Keller's motion for leave to amend his complaint.) While technically an amendment of the complaint may have been permissible, *see* 29 C.F.R. § 1614.106(d) ("A complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint."), all parties would have been better served if the amendment had not been allowed and had been made the subject of a separate complaint. Precisely because the letter came so much later in time than the swastika-drawing incident and because Keller had been away from IHS for so long when he received the letter, the usual consultation/investigation/conciliation or settlement process would have been more reasonable for all parties. What was called for, in effect, was the exhaustion of administrative remedies relative to the claim. Simply amending the complaint in effect short-circuited the exhaustion requirement. That said, however, the Court cannot fault Keller on this ground now. He was in fact permitted to amend. Even so, while the amendment may have been imprudent, neither can the agencies be faulted for failing to investigate, consult, and such. As stated earlier, whether

15

the agency even had a duty to investigate the letter sent to Keller's home is highly questionably. But, given the circumstances, while the Court finds that it would be unfair to conclude that Keller's claim is barred for failure to exhaust, it also finds that DHHS and IHS's failure to investigate or otherwise respond was excusable.

Summary judgment is therefore appropriate on Keller's hostile work environment claim.

## X.

For all these reasons, the Court will GRANT Leavitt's Motion for Summary Judgment.[8]

A separate Order will be entered.

**March 31, 2006**                                    /s/

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

---

[8]      Leavitt's Motion to Dismiss is therefore MOOT.